## Tew v. Labiche et al.

A payment on account made by the maker of a promissory note to a person not in possession of the note, nor authorized by the owner of the note to receive payment, and which was never received by the owner, will not entitle the maker to a credit for its amount.

An agent employed to make or conclude a contract has not, as a matter of course, any incidental authority to receive payments which may become due under it.

Where the title of a holder, before maturity, of a negotiable note, is not affected by any reasonable suspicion, a mere partial failure of consideration between the original parties is not sufficient to throw upon him the burden of showing for what value he became the holder.

APPEAL from the District Court of Catahoula, *Barry, J. Garrett*, for the appellant. *Taliaferro*, for the defendants. The judgment of the court was pronounced by

SLIDELL, J. The defendants having taken an order of seizure and sale upon two mortgage notes, the plaintiff obtained an injunction to stay its execution. The proceeding subsequently assumed the form of the *via ordinaria*. The notes are each for the sum of $2,549 81, dated on the 15th April, 1843, and payable, one on the 1st January, 1845, and the other on the 1st January, 1846. They are both made by the plaintiff, to the order of *Jacques Lastrapes;* and *Louis F. Lastrapes*. The note due 1st January, 1845, was protested at its ma-

turity, at the request, as appears by the notarial protest, of the cashier of the Bank of Louisiana; and it also appears, by the same instrument, that at that time the note bore the blank endorsement of the payees, of *Labiche*, and of *Follain* and *Bellocq*.

The prominent question presented in this cause is, whether the plaintiff is entitled to credit, on the note protested 4th January 1845, for a payment made by her, on the 20th February 1845, to *R. Garland*, and which is exhibited by the following receipt :—

"*New Orleans, February 20th, 1845.*

"Received of *Mrs. Sarah Y. Tew*, the sum of fifteen hundred dollars, which is to be credited on her note, to *Messrs. Jacques*, and *Louis F. Lastrapes*, for the sum of $2,549 81, due the 1st January 1845, secured by mortgage, of record in the office of the judge of the parish of Catahoula.

(Signed), R. GARLAND,

Atty. in fact of Jacques and Louis F. Lastrapes."

It is not disputed, on the one hand, that the receipt is genuine, and that the money was really paid by the plaintiff to *Garland* ; nor is it pretended, on the other hand, that *Garland* ever paid the money to the persons whose agent he assumed to be.

It must be conceded, as a general principle of law, that a payment to be valid must be made either to the lawful proprietor of the debt, or to some person authorized by him to receive it. It is also clear that payment to an agent properly authorized, is equivalent to payment to the principal. *Quod jussu alterius solvitur pro eo est quasi ipsi solutum esset.* The question then is, was *Garland* authorized by the lawful proprietors of the note to receive payment ; or was he without such authority, and his act consequently void against such proprietor ?

Before expressing an opinion on this point, it is necessary to recapitulate briefly the material facts proved at the trial, and which have been considered pertinent by counsel.

*Lastrapes, Desmare & Co.* had obtained a judgment, in the District Court at Catahoula, against *Johnson, Stone*, and others, for $4,870, with ten per cent interest, from the 24th January 1838. For this debt, the succession of *Robert Fristoe*, opened in the parish of Catahoula, was also bound. Some time previous to the 15th April 1843, *Lastrapes, Desmare & Co.* had transferred this judgment to *J. Lastrapes* and *L. F. Lastrapes*. On the 19th March 1843, *J.* and *L. F. Lastrapes*, by act under private signature, appointed *Rice Garland*, who was their brother-in-law, "their agent and attorney in fact, to sue for and adjust, settle, compromise, novate and arrange, in any way he may think best, the claims now due us, from *B. E. Johnson, Stone*, the estate of *Fristoe*, and [sued] upon in the name of *L. Lastrapes, Desmare & Co.*, in the District Court held in and for the parish of Catahoula as respects said *Johnson* and *Stone*, and probated in the Probate Court of said parish as respects the estate of said *Robert Fristoe*, and to have full and plenary powers to act in the premises, as our interest, may seem to him to require ; and all such actings and doings of our said attorney in fact shall be as obligatory and binding on us, as if transacted by ourselves."

On the 15th April 1843, *Garland*, acting under this power, and annexing it to the notarial act, transferred to the plaintiff the judgment above mentioned, and all the rights of the judgment creditors therein, with the exception of a twelve-month's bond given in that case, which was to remain in its then situation until paid by the plaintiff; in which case, she was to be fully subrogated to

TEW
*v.*
LABICHE.

the rights of the judgment creditors, the obligees in the bond. This transfer was made in consideration of the sum of $5,099 63, in payment of which *Mrs. Tew* gave the two promissory notes above mentioned, and executed in the same notarial act, to secure their payment, a mortage of certain lands and slaves, a portion of which were already encumbered by a mortgage which she had granted in favor of the succession of *Fristoe.* This latter mortgage she covenanted to pay and satisfy with the judgment conveyed to her by *Lastrapes, Desmare & Co.* The plaintiff's mortgage notes were delivered to *Garland,* as is stated in the act.

On the 6th February 1844, *Mrs. Tew* paid to *Garland* the amount of the twelve month's bond above mentioned, which was executed by *G. Mayo* as principal, and by *J. W. Stone* and *Mrs. Tew* as sureties. *Garland* gave her a written receipt for $1811, as in full for the bond, signing himself attorney in fact for *Lastrapes, Desmare & Co.;* and it is inferrable from the evidence that when he received the payment he had the bond in his possession, and delivered it to her. The bond was produced, and offered in evidence in the court below.

We have already stated that *Garland* received the $1,500 upon her note, from the plaintiff, on the 20th February 1845. In a letter, subsequently addressed by *Garland* to *Labiche,* the defendant, and which was offered in evidence by the plaintiff, he writes as follows :—

"*New Orleans, Feb.* 22, 1845.

"MY DEAR SIR: Yours of the 6th instant was handed to me by *Mr. Urbain.* I have paid him for you $600, and have his receipt. I understood that the mulatto, Henry, was bid off to you at $700, and I was to have him at that price. You are mistaken in supposing that the sum of $500 is coming on the amount received by me. It is but little more than half that sum. The amount received from *Madam Tew* on the bond was about $1750, of which $850 was paid to *Desmare* for you, and $600 to *Mr. Urbain.* If you will send down the note of *Madam Tew,* due last January, I can get $1500 on it, in the course of next month, or in April. *Colonel Tew* was here a few days ago, and has made an arrangement for the money. I told him if that sum was paid soon, indulgence would be given for the balance. I shall be in Opelousas between the 10th and 15th of next month, and will settle with you then. Respectfully and truly yours,                "R. GARLAND.

"Mr. Pierre Labiche, Opelousas."

The defendants offered in evidence the testimony of *A. Desmare,* a resident of New Orleans, who deposes that he received the plaintiff's note, due 1-4th January 1845, from *Labiche,* in April 1845, accompanied by a letter from *Labiche,* in which he says, that he had informed *Garland* that he had thought of going to the city, but, for fear of being disappointed, he sends *Desmare* the note. He states that there had been a promise to pay $1500 on account, and urges *Desmare,* if it is paid, to let him know at once. He directs him to ascertain when the debtor can pay the balance, speaks of his own urgent want of funds, and his intention, if the payment on account is not made, to foreclose the mortgage, and buy in the slaves, of which he stands in need. To this letter *Desmare* replied, acknowledging the receipt of the protested note ; stating his supposition, that *Garland* would be able to inform him where he should make application for the promised payment. Another letter was also written by *Labiche* to *Desmare,* on the 23d April 1845, in which he says, in substance, that

he had received a letter from *Garland* informing him that *Mr. Tew* could not come to New Orleans in the middle of April as he had promised, but had promised to come about the end of the month. He requests *Desmare* to see *Garland*, to ask if he could depend on getting a payment, and to say to him that, as he, *Labiche*, could not come to the city himself, he had sent the note to *Desmare* that he might receive the money from *Mr. Tew*, and have the payment endorsed on the note. *Desmare* replies, on the 28th April, as follows:—

" Votre lettre de 22 de ce mois m'est parvenu avant hier par le Panola, mon cher *Labiche ;* j'avais deja prié notre ami *Garland* de me prevenir aussitot que *Mr. Tew* serait en ville ; je l'ai revu depuis a ce sujet ; il m'a paru persuadé que ce monsieur serait ici vers la fin du mois, et m'a promis de me faire savoir quand il serait arrivé. Il faut prendre patience et esperer."

On the 11th December 1846, *J.* and *L. F. Lastrapes* executed in favor of *Labiche*, in his capacity of tutor, executor, &c., a notarial act of subrogation of the mortgage given by the plaintiff. In this act they declare that, on the 9th May 1843, they had transferred the notes to him, in his said capacities of executor, tutor, &c., in consideration of the sum of $5099 62, which they acknowledge to have received in cash.

It is admitted by the parties that *Garland* "left New Orleans and fled the country, about the last of November, or first of December, 1845, to avoid a criminal prosecution."

There are also in evidence two letters, addressed, in June and July 1846, by *Mr. Tew* to *Labiche*, requesting information about *Garland*, and asking copies of letters to *Labiche*, suggesting that they might be useful in case of proceedings against *Garland*, on behalf of *Mrs. Tew*.

It seems to us clear that, so far as *Labiche* is concerned, no authority is shown from him to *Garland*, which would have authorized the latter to obtain a payment on account of the note from the plaintiff, without the production of the note itself. The plaintiff, on this point, did not profess to treat with him as the agent of *Labiche*, but of the *Messieurs Lastrapes ;* and *Labiche*, although he evidently looked to *Garland* for advice and assistance in the matter, did not consider him as having authority to collect the money for him, nor does he appear to have expected that *Mrs. Tew* would pay it to any one without the production of the note. Hence his authorization to *Desmare*, who appears to have been his factor, to receive the money, although *Garland* too was then in New Orleans ; and hence, also, his transmission of the note to *Desmare*. An authorization from *Labiche* cannot be deduced from the collection of the bond in 1844, by *Garland*. Although *Labiche* was evidently interested in the proceeds of the collections, it does not appear that the bond had been transferred to him, nor that he had constituted *Garland* his agent to collect it, *Garland* professed to act on that occasion as the agent of *J.* and *L. F. Lastrapes ;* and besides would seem to have had the bond in his possession, as we find it went into the plaintiff's hands ; and the fair inference, in the absence of countervailing circumstances is, that she got the bond when she paid the money.

But it is contended by the plaintiff that *Labiche* is not to be considered as an ordinary holder, for value, before maturity, in the ordinary course of business ; that the plaintiff had charged in her petition that he was not the real owner of the note, that his title was fictitious, and that the transfer to him was a scheme devised by him and *Lastrapes* to defeat the equitable defence ; that, under the pleadings and the circumstances developed by the evidence, the *onus* was thrown

67

upon the defendants to make out a clear title to the notes, for a valuable consideration, before maturity; that, not having done so, the defendants must be considered as standing in the place of their endorsers, J. and L. F. Lastrapes; and that the payment to Garland would be binding upon them, were they the holders.

The evidence, taken as a whole, does not sustain the positions which her counsel assumes. But conceding, for the purposes of argument, that he is right, the case, even upon that hypothesis, is against him.

It is said by a writer of respectable authority that, if money be due upon a written security it is the duty of the debtor, if he pay it to an agent, to see that the person to whom he pays it is in possession of the security. For, though the money may have been advanced through the medium of the agent, yet, if the security do not remain in his possession, a payment to him will not discharge the debtor. He cites authorities to the effect that, even the agent's being usually employed in the receipt of money does not in this instance constitute such authority as will secure the debtor. It has been so held, in respect to money paid upon a bond to one who usually received money for the obligee, but who had not the custody of the bond in question. So, even where the obligor had for several years paid the interest and part of the principal to an agent of the lender through whom the money had been borrowed, who had not the possession of the bond, but had regularly paid the money over to the obligee, except the last payment, the obligor was adjudged to pay the last sum over again. Mr. Paley, however, observes that perhaps a *special authority* from the obligee might be shown, which would be sufficient without possession of the security. See Paley on Agency, 275.

Mr. Chitty, in common with other writers on the subject of bills and notes, declares that it is neither necessary nor prudent to pay a negotiable note to a party who is not the holder, nor without his first producing and delivering up the instrument; and observes that if, for want of distinct evidence of payment, it should be in doubt whether it was made, the mere circumstance of the instrument not having been given up, will afford a presumption against the party who alleges he has paid it.

It seems to be assumed by the plaintiff that the power given by the *Messieurs Lastrapes* to *Garland*, on the 19th March 1843, authorized him to receive the payment in question. In this view we do not concur. We consider that power, the terms of which we have given at length, as covering the settlement novation, and contract generally, made with *Mrs. Tew* on the 15th April 1843, and as expiring when that matter was finished, and the notes payable to the order of *Messieurs Lastrapes* were received by *Garland*, and delivered to his principals. Such is its reasonable interpretation; and we have not the right to strain it beyond its terms. Now, an agent who is employed to make, or negotiate, or conclude a contract, is not, as of course, to be treated as having an incidental authority to receive payments which may become due under such contract. An agent, says Mr. Story, authorized to take a bond, is not to be deemed as of course entitled to receive payments of the money due under the bond. But, if he is entrusted with the continued possession of the bond, an implication of such authority may be deduced from that fact, in connexion with the others. Story on Agency, § 98.

The circumstance of *Garland's* receiving payment of the twelve months' bond, has been considered with reference to *Labiche*; and, without repeating what

was then said, we may add that the circumstance is even weaker as against the *Messieurs Lastrapes.* It is not shown that they received any portion of that money, nor even that its collection was brought to their knowledge.

We conclude, therefore, that this court did not err in refusing the plaintaiff a credit for the money paid to *Garland.* The loss must fall on the plaintiff; and she must bear the burden of her own imprudence and misplaced confidence.

The plaintiff claims a credit of $800 upon the ground that, previous to the transfer to her of the judgment, which was the consideration of her notes, that amount had been collected by the transferrors, which was not communicated to her, nor mentioned in the act of transfer. As vendors of the judgment they warranted its existence such as it was described in the deed; and, under the evidence, we should probably reduce the notes *pro tanto,* were the payees plaintiffs here. But, in our opinion, this defence is not available against *Labiche.* He comes before us with the opinion of the district judge in his favor. We cannot say that this opinion was manifestly erroneous. The title of *Labiche,* a holder before maturity, is not under the evidence affected by any reasonable suspicion; and in such case the mere partial failure of consideration between the original parties is not sufficient to throw upon the respondent the burden of shewing for what value he became the holder. See 1 Bingham, N. C. 567. See also Greenleaf, Evid. vol. 2, § 172. *Judgment affirmed.*